UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present: Judges Beales, Russell and Senior Judge Frank


ELIZABETH CURTIN

v.     Record No. 0709-18-2

SPOTSYLVANIA COUNTY DEPARTMENT
 OF SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
DECEMBER 18, 2018


FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

(Martha Norton; Goodall, Pelt and Carper, P.C., on brief), for
appellant.

(Robert F. Beard; Shana M. Gertner, Guardian *ad litem* for the minor
children; Vanderpool, Frostick & Nishanian, P.C., on brief), for
appellee.


Elizabeth Curtin (mother) appeals the circuit court's orders finding that her children have

been abused or neglected and approving the foster care plans' goal of relative placement/adoption.

Mother argues that the circuit court erred in finding that (1) the children were abused or neglected,

as defined in Code § 16.1-228; and (2) the foster care plans' goal of relative placement/adoption

was in the children's best interests and that reasonable efforts were made to reunite the children with

mother. Upon reviewing the record and briefs of the parties, we conclude that this appeal is

without merit. Accordingly, we summarily affirm the decision of the circuit court. See

Rule 5A:27.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 386 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180 (1991)).

Mother is the biological mother to T.W., K.C., and A.C., and in April 2016, they lived with mother's husband James Curtin (father), who also is K.C. and A.C.'s biological father.[1] The Department received a complaint alleging that mother and father were abusing the children, so on April 22, 2016, a Child Protective Services (CPS) worker interviewed T.W. and K.C. at school and later at the Child Advocacy Center (CAC). Both children reported incidents in which father sexually abused them. The CPS worker spoke with mother, who agreed to a safety plan that ensured the children would not have contact with father. On April 25, 2016, the Department learned that father's vehicle was in front of the family home and mother had discussed the case with the children. Due to mother's failure to comply with the safety plan, the Department removed the three children from mother and father's care on April 26, 2016.[2] At the time of the removal, T.W. was nine years old, K.C. was six years old, and A.C. was one year old.

The Spotsylvania County Juvenile and Domestic Relations District Court (the JDR court) entered emergency removal orders on April 27, 2016, and preliminary removal orders on May 20, 2016. The JDR court ordered that mother, but not father, could have reasonable visitation with the children at the Department's discretion.

On September 1, 2016, the JDR court adjudicated that the children were abused or neglected, and on September 15, 2016, the JDR court entered dispositional orders and approved

---

[1] The whereabouts of T.W.'s biological father were unknown.

[2] The Department subsequently made a level one finding of sexual abuse against father.

- 2 -

the foster care plans' goal of return home/relative placement. Mother and father appealed the dispositional orders to the circuit court.

On February 16, 2017, the Department filed a petition for permanency planning hearing and identified relative placement/adoption as the goal of the foster care plans. On March 16, 2017, the JDR court entered permanency planning orders approving the goal of relative placement/adoption for the children. Mother and father appealed the permanency planning orders to the circuit court.

On September 8, 2017, the parties appeared before the circuit court for an adjudicatory hearing on the abuse and neglect matters. The CPS worker testified that on April 22, 2016, T.W. disclosed that father gave her "soft touches" while she was naked, and she gave father "soft touches." She also described incidents of oral sex between her and father. T.W. told the CPS worker that these encounters were "secrets" between her and father. She further stated that mother was "mean" and spanked her. The CPS worker also spoke with K.C., who said that father gave her "soft touches" and she gave him "soft touches." K.C. said that she was wearing clothes, but father was naked. The CPS worker testified that after she spoke with T.W. and K.C., she spoke with the police, the school principal, the school social worker, and a teacher.[3]

After receiving the report from the CPS worker, Detective Melissa Ridenour interviewed T.W. at school and at the CAC on April 22, 2016. T.W. told Detective Ridenour about incidents of oral sex between her and father and that she watched pornography. Detective Ridenour testified that mother was not cooperative with the investigation and insisted that T.W. was a liar.

Dr. Alan Rountree, a clinical psychologist, was qualified as an expert in child psychology and the treatment of adolescent sexual abuse victims. From May 2016 through August 2017,

---

[3] In April 2016, T.W. had talked with the assistant principal about father and "soft touches."

Dr. Rountree treated T.W., who initially reported that she was in foster care because mother and father were "yelling and screaming at one another, sometimes pushing and hitting." T.W. also stated that father was "sexually molesting" her and disclosed specific sexual acts. T.W. told Dr. Rountree that mother was aware of the alleged abuse and that mother spanked her and was mean to her. Throughout the course of the treatment, T.W. was consistent that father had sexually molested her. Dr. Rountree testified that T.W.'s understanding of sexual behavior and language for such behavior was "not developmentally expected" for a nine-year-old child and that she had to have been exposed to it in some way. Dr. Rountree found that T.W.'s statements were credible and that it would be unlikely for a nine-year-old child to remain so consistent about the abuse over fifty-two sessions if she were lying. Furthermore, Dr. Rountree stated that he could not find any alternative explanation for why she repeatedly reported the sexual abuse by father, if it were not true.

At the end of T.W.'s treatment, Dr. Rountree diagnosed her with post-traumatic stress disorder, attention deficit hyperactivity disorder, sexual abuse of a child, enuresis, and encopresis. Dr. Rountree testified that it was not in T.W.'s best interest to be reunited with father. Dr. Rountree also expressed concerns about reuniting T.W. with mother because of T.W.'s allegations that mother, even though she knew about the abuse, returned T.W. to the house. T.W. also alleged that mother was angry with her, yelled at her, and spanked her.

At the conclusion of the Department's evidence at the adjudicatory hearing, mother and father moved to strike the evidence, which the circuit court denied. Father testified and explained that "soft touches" were his way of comforting his children, by rubbing their backs or necks, but not in a sexual manner. Father denied inappropriately touching any of the children.

After hearing all of the evidence and argument, the circuit court adjudicated that the children were abused or neglected.[4]  The circuit court found that T.W. had reported the sexual abuse incidents to several people and was consistent in her account of what happened.  The circuit court also found that T.W. used very graphic language that was not typical for a child of her age, demonstrated the abuse using dolls and gestures, and had a personal knowledge about the incidents.  At the conclusion of the adjudicatory hearing, the circuit court scheduled a dispositional hearing.

Meanwhile, the Department had referred mother and father to Dr. A. James Anderson for a psychological and parenting capacity evaluation, which was completed on November 1, 2016.  Dr. Anderson diagnosed mother with major depression, post-traumatic stress disorder, parent-child relational problem, and dependent, histrionic, and paranoid personality traits.[5]  Dr. Anderson made numerous recommendations for mother and father, which included individual and family counseling, as well as a psychiatric evaluation for mother.  Mother did not comply with any of the recommendations.

On February 16, 2018, the Department filed a petition for permanency planning with the foster care goal of relative placement/adoption because of the parents' lack of compliance with services and the Department's observations of visitations and discussions with therapists and providers.  On March 16, 2018, the JDR court entered permanency planning orders that approved

---

[4] Mother and father appealed the September 8, 2017 order, but this Court dismissed mother's appeal for her failure to file an opening brief and father's appeal for his failure to submit the required filing fee.  See E. Curtin v. Spotsylvania Cty. Dep't of Soc. Servs., Record No. 1597-17-2; J. Curtin v. Spotsylvania Cty. Dep't of Soc. Servs., Record No. 1675-17-2.

[5] Dr. Anderson diagnosed father with adjustment disorder with depressed mood, rule out somatic symptom disorder with predominant pain, parent-child relational problem, and narcissistic, dependent, and compulsive personality traits.

the goal of adoption/relative placement. Mother and father appealed the permanency planning orders.

On April 18, 2018, the parties appeared before the circuit court for the dispositional hearing and the appeals of the permanency planning orders. The Department presented evidence of the services that it had offered the parents. The Department referred mother and father to a parenting class, which they completed. The Department arranged for mother to visit weekly with the children from May 26 through July 29, 2016. The Department met with mother after each visit to discuss what she did well and how to improve her parenting skills; however, mother continued to make inappropriate comments to the children during visitation. Then, on July 13, 2016, mother canceled a meeting with the Department and instructed them to contact her attorney. The Department subsequently recommended that visitation be suspended and referred mother and father to family reunification services.

In July 2016, the family reunification services therapist contacted mother and father for an assessment and to develop a plan for mother to engage in therapeutic visitation with the children.[6] Mother participated in two interviews and visited with the children on September 2, 2016.[7] During her interviews with the therapist, mother denied that any sexual abuse occurred between father and T.W. and called T.W. a liar. During the visit with the children, mother was "very reserved in her interactions" with T.W. The therapist testified that mother had a "lot of animosity and hostility" toward T.W.

When questioned by the therapist, mother denied having any mental health issues and that there was any domestic violence in their home. However, father admitted that mother might have issues with depression, anger, and post-traumatic stress disorder. Father also acknowledged

---

[6] Father was not allowed to visit with the children.

[7] Father participated in one interview.

- 6 -

that he had called the police twice for domestic violence incidents after the children were removed and had obtained an emergency protective order in August 2016; however, he "minimized the circumstances" of those incidents.

The therapist concluded that "there was a poor prognosis for reunification" because of mother's and father's denial of the allegations and the blame that they placed on T.W. for what was happening. The therapist recommended that father not have visitation with the children and that mother's visitation with T.W. be suspended until mother engaged in therapy and parenting instruction. After receiving several emails from mother in which she threatened legal action, the therapist and the agency decided to no longer offer services to the family.

On October 3, 2016, the Department arranged for mother to visit with A.C. on her birthday for one hour; however, mother was thirty minutes late to the visit and did not notify the Department that she would be late. The Department did not arrange any further visitations between the children and mother.

In addition to visitation and family reunification services, the Department recommended that mother and father participate in domestic violence services. It referred mother to the Rappahannock Area Community Services Board for individual therapy and medication management. The Department expressed concern about mother's mental health, but she continued to state that she did not understand how her mental health had anything to do with her parenting the children. Mother did not participate in any of these recommended services. Although the Department informed mother that it would be "very difficult" to return the children to her care while father was in the home, she refused to live separately from father and continued to deny the abuse allegations. Mother repeatedly claimed that T.W. lied to get attention.

At the April 18, 2018 hearing, the Department also presented evidence concerning the children's well-being. On August 14, 2017, the children moved to California to live with their

maternal aunt. The Department reported that the children had adjusted well to the move, although T.W. had behavioral issues, including tantrums, yelling, screaming, lying, and manipulating. T.W. also still had enuresis and encopresis. T.W. was participating in outpatient and in-home counseling. Neither K.C. nor A.C. was engaged in counseling, but A.C. received speech therapy.

Father testified and again denied the sexual abuse allegations. He stated that the Department told him that he could not visit with the children until he engaged in certain services and admitted that he had sexually abused T.W., which he refused to do. Mother did not testify.

At the conclusion of the hearing, the circuit court entered dispositional orders and permanency planning orders that approved the goal of relative placement/adoption. Mother appealed the circuit court's orders.[8]

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

---

[8] Father also appealed the circuit court's orders. See J. Curtin v. Spotsylvania Cty. Dep't of Soc. Servs., Record No. 0833-18-2.

*Abuse and neglect*

Mother argues that the circuit court erred in finding that the children were abused or neglected. She asserts that the only evidence the Department presented concerning the abuse was the "unverified, uncorroborated, untested statement of the child." She contends that T.W. spoke frequently about the abuse because she was asked about it repeatedly in a short period of time. Mother further suggests that T.W.'s inconsistencies in her statements prove that she was not credible.

An abused or neglected child includes any child "[w]hose parents or other person responsible for his care commits or allows to be committed any sexual act upon a child in violation of the law." Code § 16.1-228(4). The "preponderance of the evidence standard is an appropriate standard for an abuse and neglect proceeding which may lead to temporary placement of the child." Cumbo v. Dickenson Cty. Dep't of Soc. Servs., 62 Va. App. 124, 130 (2013) (quoting Wright v. Arlington Cty. Dep't of Soc. Servs., 9 Va. App. 411, 414 (1990)).

The CPS worker and Detective Ridenour interviewed T.W. and K.C. about the sexual abuse allegations at school and the CAC. Both children reported that they engaged in "soft touches" with father, and T.W. provided details, using graphic language and specific gestures, about incidents of sexual abuse committed by father. The interviews with T.W. and K.C. at the CAC were videotaped, and the video of T.W. was submitted into evidence. T.W. also told her teacher and assistant principal about the sexual abuse. Over the course of fifty-two sessions, T.W. discussed the sexual abuse with Dr. Rountree, who credited T.W.'s statements about the abuse because of the consistency of her statements, her sexual knowledge considering her age, and the language that she used. Dr. Rountree could not find any alternative explanation, including any alleged abuse by a cousin that was suggested by mother and father, to explain why T.W. repeatedly stated that father sexually abused her, if it were not true.

In finding that the children were abused or neglected, the circuit court stated that it considered the video of T.W., as well as the testimony from the CPS worker, Detective Ridenour, and Dr. Rountree. The circuit court found that T.W. reported the sexual abuse to a "number of different people . . . over a significant period of time." The circuit court held that T.W.'s language about the abuse was very detailed and "troubling." Moreover, physical evidence that the police recovered from the family home corroborated some of the details contained in T.W.'s statements.

"It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has discretion to accept or reject any of the witness' testimony." Layman v. Layman, 62 Va. App. 134, 137 (2013) (quoting Street v. Street, 25 Va. App. 380, 387 (1997) (*en banc*)). "This Court is bound by the credibility findings of the circuit court." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 339 (2013). Here, the circuit court had the opportunity to see and hear the witnesses, and it found the Department's witnesses, and T.W.'s allegations, to be credible.

Based on the totality of the evidence, the circuit court did not err in finding that the children were abused or neglected.

*Permanency planning hearing*

Mother argues that the circuit court erred in finding that the foster care plans' goal of relative placement/adoption was in the children's best interests and that reasonable efforts had been made to reunite the children with mother.

"A preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations . . . ." Boatright v. Wise Cty. Dep't of Soc. Servs., 64 Va. App. 71, 79 (2014) (quoting Najera v. Chesapeake Div. of Soc. Servs., 48 Va. App. 237, 240 (2006)).

At a foster care review hearing, the "court order shall state whether reasonable efforts, if applicable, have been made to reunite the child with his [or her] parents, guardian or other person standing in loco parentis to the child." Code § 16.1-282(D). "'Reasonable and appropriate' efforts can only be judged with reference to the circumstances of a particular case. Thus, a court must determine what constitutes reasonable and appropriate efforts given the facts before the court." Harrison v. Tazewell Cty. Dep't of Soc. Servs., 42 Va. App. 149, 163 (2004) (quoting Ferguson v. Stafford Cty. Dep't of Soc. Servs., 14 Va. App. 333, 338 (1992)). The Department "is not required to force its services upon an unwilling or disinterested parent." Tackett, 62 Va. App. at 323 (quoting Harris v. Lynchburg Div. of Soc. Servs., 223 Va. 235, 243 (1982)); see also Logan, 13 Va. App. at 130.

Here, the Department provided numerous services to mother. She completed parenting classes and a psychological evaluation. The Department arranged for mother to visit with the children; however, it had to stop the visitations after mother continued to make inappropriate comments to the children. In addition, mother remained unable to assess their needs or emotions, despite the Department's interventions and efforts. The Department referred mother and father to family reunification services. Mother participated in two interviews and one visitation, but the agency stopped providing services to the family after mother continued to deny that the abuse occurred and subsequently threatened legal action against the agency. In addition, the Department recommended that mother and father participate in domestic violence services and referred mother to the Rappahannock Area Community Services Board for individual therapy and medication management. Mother did not participate in those recommended services.

The circuit court found that the Department made reasonable efforts to reunite the children with mother. The circuit court discussed that additional services were recommended by Dr. Anderson and the family reunification services therapist, but mother did not follow up with

any of those services.  The circuit court held that it was mother's and father's responsibility to get the services that they needed, and they failed to meet that obligation.

At the time of the circuit court hearing, the children had been in foster care for approximately two years.  Mother continued to deny that father had sexually abused T.W., and mother refused to seek treatment for her mental health issues.  "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities."  Tackett, 62 Va. App. at 322 (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)).

Accordingly, the circuit court did not err in finding that the Department made reasonable efforts and that it was in the best interests of the children to approve the goal of relative placement/adoption.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is summarily affirmed.  Rule 5A:27.

Affirmed.